**Paula K. GILL, D.M.D., Appellant,**

v.

**Susan M. BURRESS, M.D., Appellee.**

No. 2011–CA–000332–MR.

Court of Appeals of Kentucky.

April 13, 2012.

Discretionary Review Denied by Supreme Court Nov. 14, 2012.

William R. Garmer, Lexington, KY, for appellant.

Clayton L. Robinson, Adam W. Havens, Lexington, KY, for appellee.

Before ACREE, MOORE, and VANMETER, Judges.

*OPINION*

MOORE, Judge:

Paula K. Gill, D.M.D., appeals a summary judgment entered by the Fayette Circuit Court in favor of Susan M. Burress, M.D., after the circuit court determined that Burress conclusively proved that Gill would be unable to establish damages arising out of Burress's alleged professional negligence in failing to detect a mass in Gill's breast consistent with ductal carcinoma for a period of approximately eighteen months. We find that issues of material fact exist relating to certain elements of damage properly recoverable by Gill, but that other damages claimed by Gill are not recoverable in this case as a matter of law. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

Burress is a doctor of obstetrics and gynecology (also known as an "Ob/GYN"), and Gill was under Burress's care and treatment from 1994 through 2005. Relevant to this case are Gill's visits to Burress's office on November 7, 2003 (when Gill was 41 years of age), and December 3, 2004 (when Gill was 42). During both visits, Burress physically examined Gill's breasts for palpable lesions and found nothing indicative of cancer. However, no record relating to Burress's treatment of Gill indicates that Burress ever recommended Gill follow up with a mammogram. Gill also testified, via deposition, that Burress advised her following both of these physical examinations that it would be unnecessary for her to obtain an additional examination by means of a mammogram.[1]

Gill further testified that she relied upon Burress's advice until early or mid-May, 2005, at which point she discovered, through self-examination, a lump about 1.7 centimeters in diameter in the upper part of her left breast. Approximately one month later, Gill obtained a mammogram of the area in question, which ultimately led to a diagnosis of stage II or IIA cancer in June, 2005. Thereafter, Gill underwent treatment that included radiation, a lumpectomy, chemotherapy, and the removal of her ovaries.[2]

On June 5, 2006, Gill filed her complaint against Burress in this matter. Gill's complaint alleged that Burress had acted neg-

---

1. Burress testified in her own deposition, however, that while she had no specific memory of recommending Gill undergo a mammogram at those times, it would have been her routine in practice to have done so.

2. According to Gill, her physician advised her to remove her ovaries to avoid complications relating to chemotherapy.

ligently in failing to recommend that Gill follow up her November 7, 2003 and December 3, 2004 physical examinations with mammograms and in dissuading Gill from doing so, and that on either occasion a mammogram of Gill's breast probably would have revealed the cancer at issue. Gill asserted that the delay in diagnosis and treatment caused her to suffer an injury. She categorized her damages as future physical pain, mental anguish, emotional distress and loss of ability to enjoy life; past and future medical expenses; loss of her ability to earn money; and lost time from her work as a dentist.

Gill produced two expert witnesses who testified via deposition in support of her claim: a surgical oncologist, Dr. Harry Bear, and a radiologist, Dr. Avinash Sud. As to the applicable standard of care, Dr. Bear testified:

DR. BEAR: I think Ob[GYNs], following a patient, acting as one of their primary care providers, should be sure that the patient—all patients, all women should have annual screening mammograms after age 40. And for women with augmentation implants,[3] they should be getting diagnostic mammograms on an annual basis because they represent a special circumstance that can make diagnosis more difficult. . . .

COUNSEL: And I believe—and, please, I'm not trying to put words in your mouth—that you said patients with breast augmentation should have diagnostic mammograms as opposed to screening mammograms, correct?

DR. BEAR: That's my opinion, yes.

COUNSEL: And that goes to some of the special circumstances that apply to that situation?

DR. BEAR: Right. They're more difficult and they need special views to see all the breast tissue.

As to the probability of a diagnostic mammogram detecting Gill's cancer prior to June, 2005, Dr. Bear further testified:

DR. BEAR: I would say 80 percent likelihood it was detectable [in 2004]. Eighty to ninety percent likelihood it was detectable six months before it was found on physical exam or self exam and probably sixty percent—sixty to seventy percent likelihood that it was detectable by mammography in 2003.

Dr. Bear also opined regarding whether Gill's regime of cancer treatment would have been less taxing if her cancer had been diagnosed prior to June, 2005:

DR. BEAR: So six months earlier, if she had not had positive nodes, she might have gotten either no chemotherapy or less aggressive or a less toxic course of chemotherapy. Certainly a year and a half earlier I think it's much more likely she would have had negative nodes and smaller—and a tumor that was less than a centimeter. In which case she might have only had radiation and hormonal therapy and might not have had to have the extra surgery to clean up the margins which she had. But that's as big a deal as having chemotherapy. I think the main difference is the chemotherapy.

COUNSEL: Okay. And then going back the year and a half or so?

DR. BEAR: Even more likely she could have avoided chemotherapy a year and a half earlier or two years earlier.

For his part, Dr. Sud testified that a mammogram probably would have detected Gill's cancerous lesion in 2004. Dr. Sud added that "if it was diagnosed earlier, all I can say is that [Gill's] survival would

3. In 2000, Gill received breast implants.

have been more favorable and her treatment would have been less."

Finally, Dr. Bear testified that as a direct result of the delay in Gill's cancer diagnosis, it was likelier that Gill could have another bout with cancer: [4]

DR. BEAR: So we tend to look at the ten-year relapse-free survival rates for patients with breast cancer. Which really tells us who's going to be cured and who's not going to be cured. And I would say that the ten-year distant relapse survival rate for a patient with stage II breast cancer is probably more like 70 to 75 percent....

COUNSEL: And what is your understanding of Dr. Gill's current condition?

DR. BEAR: As far as I know from looking at her records, she's free of disease....

. . . .

COUNSEL: And if this had been, as you've suggested, diagnosed, say, six months earlier, how would in your opinion that have changed?

DR. BEAR: So six months earlier I think is a tough time to put much on. But if I say she had a 75 percent ten-year distant disease-free survival rate, which is just a rounded number, it probably would have been more like 80, 85 percent six months earlier. But certainly closer to that 90, 95 percent a year and a half earlier.

COUNSEL: Okay. And that would be the 2003?

DR. BEAR: 2003.

After discovery was completed, Burress moved for summary judgment, arguing that Gill had asserted a claim for damages which were not recoverable under Kentucky law. Burress based her motion largely upon Dr. Bear's testimony that the treatment Gill could have received for her cancer, had her cancer indeed been discovered six months or a year and a half earlier, would only have bettered Gill's long-term prognosis for remaining cancer free by a margin of five to twenty-five percent. Burress argued that in light of Dr. Bear's testimony, Gill was currently disease-free and that it was more probable than not (*i.e.*, seventy to seventy-five percent likely) that Gill would remain disease-free. The circuit court dismissed the entirety of Gill's claim solely on the basis of this argument, and this appeal followed.

## II. STANDARD OF LAW

Summary judgment serves to terminate litigation where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rules of Civil Procedure (CR) 56.03. Summary judgment should be granted only if it appears impossible that the non-moving party will be able to produce evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 482 (Ky.1991). Summary judgment "is proper only where the movant shows that the adverse party cannot prevail under any circumstances." *Id.* at 479 (citing *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255 (Ky.1985)).

On appeal, we must consider whether the circuit court correctly determined that there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky.App.1996). Because summary judgment involves only questions of law and

---

4. Dr. Sud deferred to Dr. Bear's opinions on this topic.

not the resolution of disputed material facts, an appellate court does not defer to the circuit court's decision. *Goldsmith v. Allied Building Components, Inc.,* 833 S.W.2d 378 (Ky.1992). Our review is *de novo.*

### III. ANALYSIS

We begin our analysis by identifying Gill's injury. Gill has had cancer. Burress makes the point in her brief of stating that her negligence, if any, did not cause the cancer. Gill argues, however, that she can prove that the virulent and life-threatening effect of the disease has been exacerbated by Burress's negligent treatment and diagnosis. Specifically, Gill alleges that due to Burress's negligence, her tumor grew unchecked for a period of approximately eighteen months and required stronger and more expensive treatment to cure.

Moreover, if Gill develops symptoms of cancer in the future, this will not mean that the disease has recurred, but rather, that the disease was never completely eradicated by the delayed treatment. As the testimony in this matter bears out, if Gill is going to have a detectable recurrence in the future, then she does, in fact, presently have the disease in the form of micrometastases. And, some testimony in this matter supports that Burress's care of Gill made it less likely that Gill's cancer was completely eradicated.

In sum, Gill's claim against Burress is not based upon the infliction of an injury, but upon the aggravation of an existing condition. Kentucky has long recognized the negligent aggravation of an existing condition as a cognizable injury in its own right. *See, e.g., Louisville Taxicab & Transfer Co. v. Hill,* 304 Ky. 565, 201 S.W.2d 731, 733 (1947). The same is true in other jurisdictions, like Kentucky, that refuse to recognize a loss of chance at a better outcome, or an increased risk of future harm, as an injury. *See, e.g., Kilpatrick v. Bryant,* 868 S.W.2d 594, 603 (Tenn. 1993) (holding that a plaintiff must prove it was more probable than not that medical negligence was the cause of her injuries, but "[t]his is not to say that a plaintiff could not recover for an aggravation of his physical condition if he proves by a balance of probabilities that the negligent act or omission caused the harm when there was a better than even chance of recovering to begin with.")

A fair reading of Gill's complaint reflects that she sought the following categories of damages relating to her injury: 1) mental anguish, emotional distress, and a loss of ability to enjoy life due to an increased fear of cancer recurrence or death; 2) compensatory damages arising as a result of her chemotherapy treatment and the surgical removal of her ovaries (which Gill did, purportedly, upon her physician's advice to mitigate complications relating to chemotherapy); 3) a five to twenty-five percent decreased chance of remaining cancer-free; and 4) future medical treatment relating to a potential recurrence of cancer. As she did before the circuit court, Gill argues that summary judgment was inappropriate because evidence exists in the record indicating that she suffered these damages within a reasonable degree of medical certainty and as a proximate result of Burress's alleged negligence in allowing a malignant tumor to improperly remain in her breast for approximately eighteen months. Upon review, we find that the trial court erred in granting summary judgment as to the first and second of the above-referenced categories of damages, but properly granted summary judgment with respect to the latter two.

As to the first category of damages, Kentucky recognizes that where substantial evidence of probative value sup-

ports an increased likelihood of future complications resulting from a negligently inflicted injury and that increased likelihood, in turn, initiates serious mental distress, the resulting mental distress is compensable. *See, e.g., Kemper v. Gordon,* 272 S.W.3d 146, 150–51 (Ky.2008) (citing *Davis v. Graviss,* 672 S.W.2d 928 (Ky. 1984)). Moreover, the increased likelihood of recurrence that is responsible for the ensuing mental distress need not be anything more than a mere possibility. *See Davis,* 672 S.W.2d at 931, and at 933–34, J. Vance dissenting ("The drastic consequences which may befall movant are only possibilities and, according to the medical testimony, not very great possibilities, certainly nothing even approaching a probability.").

We are mindful of Burress's contention that it would be difficult for Gill to attribute any specific part of her existing mental anguish that is specifically related to her five to twenty-five percent increased likelihood of having cancer again, as opposed to what her mental anguish would have been even if she had been timely diagnosed with cancer. Nevertheless, this difficulty should not preclude Gill from presenting her case to the finder of fact. In this respect, we are persuaded by the logic of our sister court illustrated in *Swain v. Curry,* 595 So.2d 168, 172 (Fla. 1st DCA), *rev. denied,* 601 So.2d 551 (Fla.1992). There, the failure to timely detect a breast tumor resulted in a radical mastectomy, whereas earlier detection would have resulted in a lumpectomy. Testimony was presented that Mrs. Swain had a sixty-five percent probability that she would develop a recurrence of the cancer, whereas a timely diagnosis would have resulted in only a five to ten percent possibility of recurrence. In addressing the issue of recoverable damages, the *Swain* Court noted:

Mrs. Swain is entitled to attempt to prove that her emotional damages are presently greater as a result of such increased fear of recurrence of cancer as has resulted from any provable negligence. Such damages are recoverable, not as a separate cause of action, but as an element of personal injury damages.... Claimant in this case certainly faces a formidable obstacle in attempting to demonstrate to the satisfaction of the finder of fact that her emotional distress is of a demonstrably and quantifiably different degree now, as compared to the case of prompt diagnosis and treatment. Difficulty of proof will not, however, deprive a plaintiff of the opportunity to present her case.

*Id.* at 173 (citation omitted). Importantly, the analysis set forth in *Swain* was in no way dependent upon that increased risk of recurrence being greater than fifty percent.

■ As to Gill's claim that she suffered damage resulting from her chemotherapy treatment and the surgical removal of her ovaries in anticipation of chemotherapy, we likewise find the evidence is sufficient to present a question for the jury. Generally speaking,

[a]ll recoverable damages are subject to some uncertainties and contingencies, but it is generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount. Where it is *reasonably* certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages.

*Johnson v. Cormney,* 596 S.W.2d 23, 27 (Ky.App.1979) (emphasis added), *overruled on other grounds by Marshall v. City of Paducah,* 618 S.W.2d 433 (Ky.App.1981); *see also Hanson v. American Nat'l Bank*

*& Trust Co.*, 865 S.W.2d 302, 309 (Ky.1993) (to the same effect), *overruled on other grounds by Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 495 (Ky.2002).

■ In this respect, the testimony of Drs. Bear and Sud is capable of supporting that it was more probable than not (sixty to seventy percent likely) that a mammogram would have detected Gill's tumor a year and a half prior to her actual diagnosis, and that Gill would have received less treatment if her tumor had been discovered in 2003 or 2004. Furthermore, while Dr. Bear's testimony relating to Gill's chemotherapy is somewhat equivocal, it is our duty to review his testimony in the light most favorable to Gill; in this light, we find his testimony capable of supporting that it is more likely than not that chemotherapy would have been unnecessary if Gill's tumor had been discovered in 2003.

■ We find no error, however, in the circuit court's determination that any future medical treatment relating to a potential recurrence of cancer is non-compensable. As noted above, Kentucky law allows a plaintiff to recover for damages only where the fact of damage is reasonably certain. *See Cormney*, 596 S.W.2d at 27. Here, according to the evidence of record, Gill is currently cancer-free and it is at least seventy percent likely, *e.g.*, more likely than not, that she will suffer no recurrence of cancer and, therefore, require no future medical treatment for it.

■ Similarly, we find no error in the circuit court's determination that Gill's purportedly five to twenty-five percent decreased chance of remaining cancer-free is non-compensable. Without laboring the point, a majority of jurisdictions consider a decreased chance for long-term survival, or lost chance for recovery or a better medical result (due to negligence), as a compensable injury,[5] a minority of jurisdictions do not,[6] and Kentucky is in the minority. *See Kemper*, 272 S.W.3d 146. Kentucky law also prohibits the possibility of future harm from constituting an element of damages if that possibility is considered outside the realm of damages for mental anguish. *Id.* at 150–151 (distinguishing *Davis*, 672 S.W.2d 928); *but see United States v. Anderson*, 669 A.2d 73, 78 (Del.1995) (declining to regard fifteen percent increased risk of cancer as a legally recognized injury, but allowing increased risk, in and of itself, to be considered as an element of damages as demonstrative of a significantly greater injury).

■ In rebuttal, Gill argues that *Kemper* represents a gross misapplication and misinterpretation of Kentucky precedent, and urges this Court to overrule the Su-

---

**5.** A review of the reported cases that have considered the doctrines of "increased risk of harm" and "lost chance" indicates a wide disparity in acceptance and application. *See, e.g., Causation–Loss of Chance*, 54 A.L.R.4th 10 (1987); *Damages–Loss of Chance*, 81 A.L.R.4th 485 (1990). Nevertheless, we believe, like the Supreme Court of Delaware, that "Since loss of chance and increased risk of harm both rely on similar theoretical underpinnings ... it would not be coherent to adopt increased risk without also adopting loss of chance." *United States v. Anderson*, 669 A.2d 73, 75–76 (Del.1995).

**6.** For a fairly recent breakdown of these jurisdictions, as well as an extensive analysis of the policies behind allowing for this type of recovery, *see Matsuyama v. Birnbaum*, 452 Mass. 1, 890 N.E.2d 819 (2008). Notably, Tennessee, Delaware, and Florida, whose law we have briefly surveyed as persuasive authority, are among the jurisdictions noted in *Matsuyama* that either do not recognize this doctrine, or find it otherwise incompatible with existing precedent. *See id.* at 829 (citing *Gooding v. University Hosp. Bldg., Inc.*, 445 So.2d 1015 (Fla.1984)); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602–603 (Tenn.1993); *United States v. Cumberbatch*, 647 A.2d 1098, 1102–1104 (Del.1994)).

preme Court on a variety of grounds. Suffice it to say, however, that "[t]he Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court." Rules of the Supreme Court (SCR) 1.030(8)(a). We find that the circuit court did not misapply the *Kemper* holding in this respect and we therefore find no error because we "cannot overrule the established precedent set by the Supreme Court[.]" *Smith v. Vilvarajah,* 57 S.W.3d 839, 841 (Ky.App.2000) (citing *Special Fund v. Francis,* 708 S.W.2d 641, 642 (Ky.1986)).

## IV. CONCLUSION

For these reasons, the summary judgment of the Fayette Circuit Court is affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.

ALL CONCUR.